IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION



PILGRIM CONSTRUCTION CO., LLC                                    PLAINTIFF

versus                                    Civil Action No. ___5:15 cv 87 DCB-MTP___

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA and CATLIN SPECIALTY
INSURANCE COMPANY                                    DEFENDANTS

## COMPLAINT

### (Jury Trial Demanded)

COMES NOW Pilgrim Construction Co., LLC, by and through its attorneys of record,

and files this Complaint against the Defendants, National Union Fire Insurance Company of

Pittsburgh, PA and Catlin Specialty Insurance Company, showing in support hereof the following

facts and matters, to wit:

### I

### Description of Action

Pilgrim Construction Co., LLC ("Pilgrim") seeks declaratory and other relief against two

of its insurers arising out of their duty to provide a defense to Pilgrim for claims asserted against

it by REM Directional, Inc. One of Pilgrim's insurers, National Union Fire Insurance Company

of Pittsburgh, PA, has wrongfully refused to provide any defense to Pilgrim. The other insurer,

Catlin Specialty Insurance Company, has breached duties it owes to Pilgrim under both the

insurance contract and the rule of law established by *Moeller v. American Guarantee and*

*Liability Insurance Company*, 707 So.2d 1062 (Miss. 1996).

## II

### Parties

1.      Plaintiff, Pilgrim Construction Co., LLC ("Pilgrim"), is a Mississippi limited liability company having its principle place of business at 2419 Highway 528, Heidelberg, Mississippi 39439.

2.      Defendant, National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), is a foreign insurance company having its principal place of business in the state of Pennsylvania.  National Union's agent for service in the state of Mississippi is United States Corporation Company, 506 South President Street, Jackson, Mississippi 39201.

3.      Defendant, Catlin Specialty Insurance Company ("Catlin"), is a foreign insurance company having its principal place of business in the state of  Delaware.  Catlin's agent for service in the state of Mississippi is the Honorable Mike Chaney, Mississippi Commissioner of Insurance.

### III

### Jurisdiction

4.      This Court has original jurisdiction of this action pursuant to the provisions of 28 USCA § 1332 in that complete diversity of citizenship exists between the Plaintiff, on the one hand, and National Union and Catlin, on the other, and the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

5.      This court has *in personam* jurisdiction over National Union in that it is licensed to do business in Mississippi and was doing business in Mississippi by issuance of a policy of commercial general liability insurance to Pilgrim.

6.      This court has *in personam* jurisdiction over Catlin in that it is authorized to do business in Mississippi as a non-admitted insurance company and was doing business in Mississippi by issuance of a policy of professional liability insurance to Pilgrim.

## IV

## Venue

7.      This Court has venue of this action pursuant to the provisions of 28 USCA § 1391 in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred or accrued within the Western Division of the Southern District of Mississippi.

## V

## The Bayou Pierre Pipeline Project

8.      Pilgrim is a Mississippi limited liability company which services the oil and gas industry through various business activities, including but not limited to, the construction and maintenance of pipelines.

9.      In 2013 Pilgrim bid upon, and was awarded a pipeline project in Claiborne County, Mississippi.  The Bayou Pierre project involved underground horizontal drilling to create a 5,474 foot subsurface channel, into which a 42 inch natural gas pipeline would be installed.

10.      Pilgrim subcontracted with REM Directional, Inc. ("REM") for performance of the horizontal subsurface drilling.  REM's written proposal to Pilgrim excluded geotechnical or subsurface exploration from REM's scope of work.  The final Subcontractor Agreement, dated November 11, 2013, states that REM shall be entitled "to rely upon the accuracy and completeness of all information" provided by Pilgrim and/or the project owner, including "any and all geotechnical information".

-3-

11.     In anticipation of the work, Pilgrim gave REM the Geotechnical Investigation report which had been furnished to it by the project owner.  The report classified the strata in which the subsurface drilling would take place as part of the Catahoula Formation and provided a comprehensive description of the Catahoula Formation, making it clear that REM would likely encounter rock during the drilling process:

> The Catahoula typically consists of silts, sands and *gravels* with occasional irregular lenses of dark marine clays and thin lenticular seams of *sandstones, which were encountered in this investigation.*  Additionally, the clay units are typically hard and have a blocky to conchoidal structure.  This is a significant feature when considering directional drilling as clays can have collapses in open vertical or horizontal holes.  *The gravel lenses will vary in thickness but will all be quartzitic (chert) and very hard.*  Fine content in gravel zones vary significantly from very low content to near 80% content based on the speed at which they were deposited.  (emphasis added)

REM did not seek any clarification of the information contained in the Geotechnical Investigation report or request any additional subsurface information from Pilgrim.

12.     REM began work on the project on December 30, 2013 and continued its horizontal drilling until the diameter of the subsurface channel was large enough to accommodate the 42 inch pipeline.  REM then swabbed the channel to ensure that it was free of obstructions.  At no time during the drilling and swabbing process did REM suggest that the subsurface conditions were anything other than what the Geotechnical Investigation report disclosed or what REM expected to encounter.

13.     The next step - installation of the 42 inch gas pipeline into the subsurface channel - required the use of a drilling pipe by REM.  The drilling pipe is a hollow pipe, through which drilling fluid may flow, configured on its end for secure attachment to the 42 inch pipeline.  REM ran the drilling pipe the length of the channel and attached its end to the 42 inch pipeline , in

preparation for pulling the 42 inch pipeline back through the channel upon extracting the drilling pipe.

14.     However, REM's drilling pipe broke shortly after it began pull-back of the 42 inch pipeline, shutting down the operation. When this event occurred, REM alleged, for the first time, that the subsurface conditions differed from those described in the Geotechnical Investigation report.

15.     REM removed the broken pipe and cleared the channel, using other devices to cut out and remove what REM contended was a "rock ledge" at the approximate location where the drilling pipe has broken. REM then inserted a new drilling pipe in the channel in a second attempt to pull-back the 42 inch pipeline. During the second pull-back, REM's drilling pipe broke again. Subsequently, REM abandoned the pull-back method and installed the 42 inch pipeline in the channel using more effective, but more costly, means.

16.     On information and belief, REM's drilling pipes from the first and second break occurrences have been tested, and the test results exclude metallurgical and/or structural failure of the drilling pipe material as a cause of the breaks.

## VI

### Allegations of the Claim made by REM against Pilgrim

17.     Pilgrim's counsel placed REM on notice on March 14, 2014 of a claim by Pilgrim against REM for reimbursement of the additional project cost which Pilgrim incurred due to the drilling pipe failures. On the same day, by letter to Pilgrim's counsel, REM responded that the drilling pipe failures occurred because of "differing and unforseen site conditions - specifically, rock formations below the surface of the ground", and "[A]s a consequence of the differing site

-5-

conditions, REM has incurred a significant amount of damages including ... equipment and material costs ..."

18.     REM's March 14, 2014 letter further alleged negligence or misrepresentation by Pilgrim, stating "we will look to Pilgrim, its surety, and its liability insurance carriers to reimburse REM for all costs, expenses and damages arising out of the site conditions that REM encountered on the project that differed from those represented by Pilgrim.  Please place Pilgrim's CGL and excess carriers on notice of our claim immediately."

19.     On April 4, 2014 Pilgrim filed a *Motion to Compel Arbitration and Stay this Legal Proceeding or, in the Alternative, Complaint for Damages* against REM in the Circuit Court of Jasper County, Mississippi.

20.     REM responded in the Jasper County Circuit Court by filing its *Response to Motion to Compel Arbitration and Answer, Affirmative Defenses, and Counterclaim of Defendant REM Directional, Inc.* on July 28, 2014.  In support of its counterclaim against Pilgrim, REM alleged:

a.     That REM had the right to rely on the accuracy and completeness of the geotechnical information furnished by Pilgrim, which REM alleged was not accurate or complete;

b.     That the first and second drilling pipe breaks occurred due to significantly different subsurface conditions (*i.e.,* rock) which Pilgrim failed to disclose and which REM encountered on the Bayou Pierre site;

c.     That REM incurred significant costs and damages due to the first and second drilling pipe breaks;

-6-

      d.      That REM's operations during the first and second drilling pipe breaks were monitored by REM personnel and/or the project owner's engineer, such that the pressures placed on the drilling pipe during both occurrences were monitored and recorded; and

      e.      That the pressures placed on the drilling pipes during the first and second pull-back operations never exceeded the design limits of the drilling pipes.

Hence, REM's counterclaim specifically disclaimed that the drilling pipe failures were caused by any error or failure on the part of REM to perform in a good and workmanlike manner.

## VII

### Pilgrim's Claims Against National Union And Supporting Facts

**A.**      **Coverage afforded by the National Union policy**

21.      National Union, in consideration of Pilgrim's payment of a $125,750 premium, insured Pilgrim from June 1, 2013 to June 1, 2014 under commercial general liability policy number GL1903165 which extended coverage during a policy period of June 1, 2013 to June 1, 2014 (hereinafter referred to as the "National Union policy" or "CGL policy").

22.      The National Union policy covers "property damage" caused by an "occurrence" which is covered by the policy. Property damage means "physical injury to tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured". The policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions".

23.      The CGL policy's Insuring Agreement obligates National Union to provide a defense to Pilgrim for any suit seeking recovery for property damage caused by an occurrence:

SECTION I - COVERAGES

COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.     Insuring Agreement

a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of .... "property damage" to which this insurance applies. *We will have the right and duty to defend the insured against any "suit" seeking those damages.* However, we will have no duty to defend the insured against any "suit" seeking damages for ... "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result ... (emphasis added)

Further, a "suit" against which National Union must defend includes "arbitration proceedings".

24.     The CGL policy contains various business-risk exclusions which incorporate a definition of "your work" in the policy. The policy defines "your work" as "work or operations performed by you or on your behalf", and arguably, work performed on behalf of Pilgrim may include work performed by a subcontractor for Pilgrim, such as REM.

25.     Of primary import in this matter, the "your work" definition is incorporated in a business-risk exclusion at section A.2.j(6) of the policy, which excludes coverage for property damage to:

(6) That particular part of any property that must be restored, repaired or replaced *because* "your work" *was incorrectly performed on it.*

(emphasis added)

**B.**     **National Union's refusal to defend Pilgrim**

26.     On April 29, 2014 Pilgrim's counsel placed National Union on notice of REM's claim and provided National Union with numerous documents relating thereto, including the March 14, 2014 letter from REM which asserted such claim against Pilgrim based on the

-8-

allegation of differing subsurface conditions. Pilgrim's April 29, 2014 letter to National Union included the request that National Union provide Pilgrim with a defense to REM's claim.

27.     Receiving no response from National Union, Pilgrim again corresponded with it on September 26, 2014 and provided National Union with additional documents pertinent to REM's claim, including all pleadings filed by Pilgrim and REM as of that date. Again, Pilgrim requested that National Union provide it a defense for REM's claims.

28.     On November 24, 2014 Mark Senterfeit, acting on behalf of National Union, denied Pilgrim's request for coverage under the CGL policy. Mr. Senterfeit's letter of that date erroneously contends that damage to REM's drilling pipes did not constitute property damage; was not caused by an occurrence, as defined in the policy; and/or was subject to various policy exclusions, none of which even arguably apply to REM's claim against Pilgrim. Despite its faulty reasoning, Mr. Senterfeit's letter unmistakably disclaimed coverage, declaring "[National Union] will not provide [Pilgrim] a defense with regard to this complaint, nor will we indemnify [Pilgrim] for any settlement verdict or judgment awarded as a result."

29.     Pilgrim disputed National Union's coverage decision, pointing out in a March 4, 2015 letter from its counsel that:

    a.     REM's drilling pipes and equipment are unquestionably tangible property which REM alleges sustained physical injury, meeting the definition of "property damage" under the policy;

    b.     REM's drilling equipment sustained property damage due to an "occurrence", defined as an "accident" in the policy, since there is no allegation that the equipment was intentionally damaged. Rather, REM alleges the equipment broke

because REM encountered subsurface conditions which were different from those that had been disclosed to REM or which REM expected;

      c.    REM's assertion of certain contract-based claims against Pilgrim does not detract from the substance of REM's claim that its drilling equipment was damaged due to the occurrence of undisclosed and unexpected subsurface conditions, even though Pilgrim denies the veracity of such contentions; and

      e.    The Underground Resources and Equipment Coverage endorsement in National Union's policy precludes National Union's reliance on the business-risk exclusions to coverage cited in Mr. Senterfeit's previous correspondence.

30.    On March 23, 2015, Pilgrim transmitted to National Union the *Answering Statement and Counterclaim Request* which REM filed with the AAA, which clearly asserts REM's claim against Pilgrim for "damaged equipment and drill pipes".

31.    Despite receiving clear evidence of allegations of property damage covered by the policy, National Union repeated its refusal to provide Pilgrim with a defense in its correspondence dated May 15, 2015. This time, Mr. Senterfeit focused on business-risk exclusion A.2.j(6), arguing that such provision precluded coverage simply because the damage occurred to Pilgrim's work. However, National Union reliance on this exclusion ignores the causation requirement embedded therein – the exclusion only precludes coverage for damage to property "because your work was incorrectly performed on it." National Union has not identified (a) what specific work was incorrectly performed, and (b) how any incorrectly performed work caused physical damage to REM's tangible property. Indeed, the allegations against Pilgrim, on which National Union must base its coverage decision, are to the contrary – REM's pleadings

specifically deny the performance of any incorrect work.

### C.   Claim for breach of contract against National Union

32.     Under the commercial general liability policy issued to Pilgrim, National Union has an absolute duty to provide a defense to Pilgrim for claims covered by the policy, including claims which are even arguably covered or which present any basis for potential coverage under the policy. Further, National Union is required by law to base its decision to defend Pilgrim on the conduct of Pilgrim, as alleged by REM, rather than the particular legal theories asserted in REM's counterclaim against Pilgrim.

33.     National Union breached its duty to defend Pilgrim against the claim asserted by REM, in that:

a.     National Union based its refusal to defend Pilgrim on the erroneous conclusion that REM's claim does not allege "property damage" arising from an "occurrence", as defined in the policy;

b.     National Union assumed, without factual basis, predicates for application of coverage exclusions under the commercial general liability policy;

c.     National Union refused to apply the coverage available to Pilgrim under the Underground Resources and Equipment Coverage endorsement of the policy, which if applied, precludes National Union from relying upon the business-risk exclusions contained in the policy; and

d.     For the above reasons and others to be shown at trial, National Union has wrongfully refused to provide a defense to Pilgrim for REM's claims under the terms and

provisions of the commercial general liability insurance policy.

34.     Due to National Union's breach of contract, Pilgrim is entitled to recover from National Union all costs expended, or which will be expended, in defense of the claims asserted by REM.  To date, Pilgrim has incurred costs for attorney's fees, expert witness charges and other expenses, and arbitration costs in the amount of $336,117.35, which costs are expected to increase.

**D.     Claim against National Union for breach without a legitimate or arguable reason**

35.     National Union lacks a legitimate or arguable reason or basis for its refusal to provide a defense to Pilgrim, and consequently, Pilgrim is entitled to recover from National Union extra-contractual damages available under Mississippi law, including damages for Pilgrim's inconvenience and all attorney's fees and expenses which Pilgrim will incur in the prosecution of this action.

**E.     Claim against National Union for tortious breach of contract**

36.     The duty of good faith and fair dealing inheres in every contract, including the commercial general liability policy which is the subject of this action, and applies to National Union's performance of its contractual obligations.  Pursuant to such duty, National Union is required to place the interests of its insured ahead of its own and to exercise the utmost good faith in performance of its contractual obligations.

37.     National Union breached its duty of good faith, acting in bad faith and without a legitimate or arguable basis, by wrongfully concluding that REM's claim does not allege

-12-

"property damage" caused by an "occurrence"; by wrongfully assuming predicates for the application of coverage exclusions under the policy; by wrongfully refusing to apply for Pilgrim's benefit the coverage available under the Underground Resources and Equipment endorsement of the policy; and by wrongfully refusing to provide a defense to Pilgrim for REM's claim, even though REM's allegations against Pilgrim present a potential basis for coverage under the policy.

38.     National Union's bad faith is attended by conduct on its part which is willful, malicious, grossly negligent, reckless of Pilgrim's rights as an insured, and which rises to the level of an independent tort.  Consequently, National Union is liable to Pilgrim for punitive damages in an amount sufficient to punish it for its egregious conduct and to deter it, and other similarly situated insurers, from like conduct in the future.

39.     In the event of an award of punitive damages, Pilgrim is entitled to recover of and from National Union all reasonable attorneys' fees which Pilgrim has incurred, or will incur, in the prosecution of this action.

## VIII

### Pilgrim's Claims Against Catlin And Supporting Facts

**A.     Coverage afforded by the Catlin policy**

40.     Catlin, in consideration of Pilgrim's payment of a $39,000 premium, insured Pilgrim from June 1, 2013 to June 1, 2014 under professional liability policy number CPV-675792-0614 (hereinafter referred to as the "Catlin policy" or "professional liability policy").

41.     The Catlin policy affords coverage to Pilgrim for all sums, subject to coverage limits and a deductible, which Pilgrim is legally obligated to pay as damages because of a

-13-

professional claim arising out of an alleged negligent act, error or omission with respect to professional services rendered by Pilgrim.

42.      "Professional services" under the policy include services performed by Pilgrim in its capacity as a construction manager or developer.  The policy defines "professional claim" as "any demand, demand for arbitration or mediation or suit" alleging liability of the insured and seeking damages for the correction of professional services.

43.      The policy applies a deductible, in the amount of $50,000.00, to claim expense which includes "reasonable and necessary fees for attorneys, arbitrators, mediators, consultants and expert testimony as well as court and arbitration costs and expenses".

44.      The professional liability policy provides that Catlin "will defend the insured, with counsel of our mutual agreement, because of a professional claim .... subject to the applicable deductible and the limit of liability stated in the declarations ..."

45.      A policy section entitled "Notice of Circumstances" provides the insured a means for the early reporting of potential claims, stating that the insured may give Catlin written notice of acts, errors or omissions expected to give rise to a claim, and in such event, the claim "for which coverage is provided by this policy ... *shall be deemed for the purpose of this insurance to have been made on the date on which the notice was mailed by the insured.*"  (emphasis added)

**B.      Catlin's violation of Pilgrim's contractual and *Moeller* rights**

46.      On or about March 28, 2014, BancorpSouth Insurance Services, acting on behalf of Pilgrim, gave Catlin written notice of REM's claim, and Catlin adjuster Matthew Ford acknowledged receipt of the claim on April 2, 2014.  Shortly thereafter, Matthew Ford discussed

-14-

REM's claim with employees of Pilgrim.  Pilgrim, directly and through counsel, timely provided Catlin with all information within Pilgrim's knowledge concerning REM's claim, and specifically informed Catlin about the site investigations (being conducted by attorneys and experts) underway to determine the cause of the drilling pipe breaks, the results of which investigations were essential to Pilgrim's defense.  Despite such communications, Catlin did not offer to fund the ongoing investigations or undertake its own investigation.

47.    Catlin assigned a claim number to the file but otherwise took no action to investigate the claim or develop Pilgrim's defense.  Catlin's subsequent inquiries to Pilgrim about the claim were sporadic at best and fell far short of fulfillment of its obligations to investigate and defend under the professional liability policy.

48.    Catlin thereafter assigned the file to a new adjuster, Josie Nackers, who contacted Pilgrim to inquire about any "updates" on September 16, 2014.  On September 22, 2014 Pilgrim transmitted to Catlin a computer disc containing claim information and hard copies of the Circuit Court and Arbitration pleadings.

49.    Although Ms. Nackers of Catlin acknowledged that Pilgrim reported the claim to Catlin in March of 2014, Catlin only offered to provide a defense to Pilgrim beginning on September 22, 2014.  Even then, by correspondence from Ms. Nackers dated September 22, 2014, Catlin only offered to provide Pilgrim a defense under a full reservation of rights by Catlin.

50.    Catlin's provision of a defense under a reservation of rights invoked Pilgrim's right to separate and independent counsel under *Moeller v. American Guarantee and Liability Insurance Company*, 707 So.2d 1062 (Miss. 1996), and therefore, Pilgrim's counsel provided a copy of the *Moeller* decision to Ms. Nackers.  Ms. Nackers either failed to read *Moeller*, or

-15-

completely disregarded the decision, since she retained a Catlin panel attorney, working "at significantly negotiated rates" according to Ms. Nackers, to defend both Catlin and Pilgrim.

51.     On September 29, 2014 attorney Christopher Solop of Biggs, Ingram & Solop PLLC (hereinafter collectively "the Solop firm") notified Ms. Nackers that Pilgrim had selected the Solop firm as its independent *Moeller* counsel. Thereafter, Catlin discharged the panel attorney it had retained, and to date, the Solop firm has served as the only counsel providing a defense to Pilgrim for the claims asserted by REM.

52.     However, failing to recognize that *Moeller* entitles Pilgrim to separate and independent counsel to represent solely Pilgrim's interests, Ms. Nackers transmitted an October 6, 2014 email to Mr. Solop, attaching the Catlin Litigation Management Guidelines, and requesting that the Solop firm "agree to follow Catlin's litigation management guidelines" in its representation of Pilgrim. The Catlin Litigation Management Guidelines give Catlin the right to control Pilgrim's defense by *Moeller* counsel and require, among other things:

          a.     An "Agreed to Strategy", imposing the requirement that Catlin agree to the litigation strategy for the insured's defense;

          b.     The development of a litigation budget conforming to "the agreed-upon litigation strategy" and gives Catlin the right to refuse payment of attorney invoices which deviate from the budget;

          c.     Catlin's prior approval for the engagement or retention of experts or other outside consultants;

          d.     Catlin's specific approval of the work to be performed by the attorney on behalf of the insured, including but not limited to, responding to a complaint against the

-16-

insured; conducting discovery and depositions; initiating or participating in settlement discussions; proceeding to trial; long distance travel; selection of litigation support; the preparation of dispositive and other substantive motions; filing an appeal; and proceeding with any form of alternative dispute resolution; and

   e.   Counsel's agreement to Catlin's Terms of Severance, which provide that "The decision to terminate an appointment, to transfer the matter to other counsel and/or another law firm or to otherwise *restrict a counsel's handling of a particular matter shall be entirely at Catlin's discretion.*"

(emphasis added)

   53.   Appropriately, Mr. Solop informed Ms. Nackers that Catlin's attempt to impose litigation management guidelines on his firm is contrary to his firm's status as independent *Moeller* counsel for Pilgrim. Undeterred, Ms. Nackers pressed Mr. Solop again on October 21, 2014 to agree to Catlin's Litigation Management Guidelines, stating "Your firm will be reimbursed for the reasonable and necessary fees and costs incurred in the defense of the Insured subject to the terms and conditions set forth in Catlin's Litigation Management and Billing Guidelines".

   54.   Mr. Solop, by letter on October 24, 2014, reiterated to Ms. Nackers that *Moeller* affords Pilgrim the legal right to select its own independent counsel and stated "There is nothing in Catlin's policy or Mississippi jurisprudence that requires *Moeller* defense counsel to adhere to the Catlin U.S. Litigation Management Guidelines. These guidelines are clearly intended for Catlin's panel counsel and are not specifically referenced in Catlin's policy".

   55.   On November 17, 2014 Mr. Solop submitted his firm's invoice for attorney's fees

-17-

and expenses related to Pilgrim's defense to Catlin. The inclusive dates of services reflected on such invoice were from February 7, 2014 to November 6, 2014. Despite the fact that Pilgrim reported REM's claim to Catlin in March 2014, Catlin took the untenable position that it would not reimburse Pilgrim for any defense costs incurred prior to September 22, 2014. Although Pilgrim has communicated to Catlin its disagreement with such position, asserting that coverage under the policy was triggered when Catlin received notice of REM's claim, Catlin has continued to wrongfully refuse to reimburse Pilgrim for defense costs incurred before September 22, 2014.

56. Rather than compensate the Solop firm as *Moeller* counsel for its actual time and expense incurred in defending Pilgrim, Catlin has also adopted the arbitrary position that Pilgrim should only be reimbursed for fifty percent (50%) of its *Moeller* fees and expenses. In such regard, Catlin has disputed the invoices from the Solop firm; argued with Mr. Solop about the necessity of his firm's charges; and applied its arbitrary 50% formula to all invoices of the Solop firm for work done on September 22, 2014 or thereafter. Time and again, Pilgrim, through Mr., Solop, has registered its disagreement with Catlin's failure to fully reimburse Pilgrim for its costs of defense, all to no avail. Thus, Catlin has only reimbursed Pilgrim and/or paid the Solop firm the amount of $36,569.67 to date, although Pilgrim's total expenses incurred in defense of the REM claim total $336,117.35.

57. Frustrated with Mr. Solop's refusal to relent to Catlin's litigation management guidelines, and his continued insistence that Catlin reimburse Pilgrim pursuant to *Moeller*, Catlin, through Ms. Nackers, engaged in a malicious attempt to induce Pilgrim to terminate Mr. Solop as *Moeller* counsel. On March 16, 2015 Ms. Nackers emailed Brian Pilgrim, Pilgrim's general manager, regarding Catlin's "concerns about the scope of Mr. Solop's role and his

-18-

possible conflict of interest". When Mr. Pilgrim inquired what Ms. Nackers meant by "conflict

of interest", Ms. Nackers emailed Mr. Pilgrim that "I think it would be best for you and I to

discuss by phone".

58. Ms. Nickers telephoned Mr. Pilgrim on April 6, 2015 and made the following

statements which were calculated, on her part, to induce Pilgrim to terminate Mr. Salop, and in

turn save Catlin the expense of compensating *Moeller* counsel:

a. That Mr. Salop is recalcitrant and difficult to work with;

b. That allowing Mr. Salop to speak on behalf of Pilgrim is not an effective line of communication;

c. That Mr. Salop was overly adversarial in response to Catlin's attempt to retain a panel attorney to defend Pilgrim and Catlin, under Catlin's reservation of rights;

d. That Mr. Salop is making it very difficult for Catlin to defend Pilgrim and get coverage for REM's claim against Pilgrim;

e. That Mr. Salop is standing in the way of Catlin getting this claim resolved for Pilgrim;

f. That Mr. Salop has failed to honor his agreement to abide by Catlin's Litigation Management Guidelines;

g. That Catlin is defending Pilgrim under a reservation of rights, and in these situations, it is cleaner if one attorney prosecutes Pilgrim's claim against REM and a separate attorney represents the interest of both Catlin and Pilgrim in defending REM's claim;

h. That Mr. Salop has created a conflict of interest by acting as coverage counsel for Pilgrim, which Mr. Salop cannot do because he represents both Catlin and Pilgrim;

I. That Mr. Salop has conducted himself improperly by attempting to collect the attorney's fees and other costs of defense incurred by Pilgrim from Catlin;

j. That it is inappropriate for Mr. Salop to act as defense counsel because he has crossed lines that need to be maintained from a professional standpoint;

-19-

k.       That Mr. Salop is not acting in Pilgrim's best interest because he is failing to cooperate with Pilgrim; and

l.       That Mr. Salop is not acting in Pilgrim's best interest because he disputes Catlin's positions with regard to its liability for defense costs.

Ms. Nickers concluded her conversation with Mr. Pilgrim by stating that Mr. Salop could be replaced, at any time with Pilgrim's consent, by another attorney which Catlin could assign to defend Pilgrim.

59.      Catlin's statements, through Ms. Nickers, to Mr. Pilgrim, a layman unfamiliar with the rights vested in Pilgrim by *Moeller*, were false, legally erroneous, and outrageous and demonstrated Catlin's malice and reckless disregard of its insured's rights.  Catlin continues to demonstrate such tortuous state of mind by its obstinate refusal to abide by *Moeller* and fully reimburse Pilgrim for its costs of defense, including but not limited to, the fees and expenses presented to it by the Salop firm.

60.      To date, Catlin has only reimbursed Pilgrim the amount of $36,569.67 even though Pilgrim has incurred attorney's fees, expert witness and consultant fees, expenses of litigation, and arbitration costs in the amount of $336,117.35 in defense of REM's claim.

61.      The hearing date for arbitration of REM's claim against Pilgrim is approaching, and Pilgrim reasonably expects that its costs of defense will increase.  Nevertheless, Catlin continues to maintain the untenable and arbitrary positions that :

a.       It owed no duty to provide a defense to Pilgrim before the date of September 22, 2014 and will not reimburse Pilgrim for defense costs incurred prior to that date;

b.       It only owes Pilgrim fifty percent (50%) of the defense costs incurred by

-20-

Pilgrim from and after September 22, 2014; and

     c.    The Salop firm, Pilgrim's *Moeller* counsel, must abide by Catlin's

Litigation Management Guidelines.

Such conduct on the part of Catlin constitutes willful and wrongful breach of Pilgrim's rights

under the professional liability policy and Pilgrim's rights under *Moeller v. American Guarantee*

*and Liability Insurance Company*, 707 So.2d 1062 (Miss. 1996).

### C.    Claim against Catlin for Declaratory Judgment

    62.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, Catlin's

attempt to enforce the Catlin Litigation Management Guidelines upon Pilgrim's *Moeller* counsel,

the Salop firm, presents a case of actual controversy.  Pilgrim seeks a declaratory judgment to

declare the rights and legal relations of the parties with regard to the imposition of the Catlin

Litigation Management Guidelines upon its *Moeller* counsel and to terminate any uncertainty

and/or controversy with regard to such issue.

    63.    Pursuant to *Moeller v. American Guarantee and Liability Insurance Company*,

707 So.2d 1062 (Miss. 1996), the Salop firm does not represent Catlin in any capacity.  As

*Moeller* counsel, the Salop firm owes its duty and allegiance solely to its client, Pilgrim, even

though Catlin is liable under *Moeller* for compensating the Salop firm for its representation of

Pilgrim.

    64.    A lawyer shall not accept compensation from one other than the client unless

"there is no interference with the lawyer's independence of professional judgment or with the

client-lawyer relationship".  *Mississippi Rule of Professional Conduct 1.8 (f)(2)*.  Insurer-paid

defense counsel owes a duty to exercise his independent legal judgment for the benefit of the insured client and may not delegate such duty to the insurer *via* litigation management guidelines or agreements which give the insurer the right to approve preparation of the client's defense (*e.g.*, the right to approve depositions, discovery, the retention of experts, and the conduct of pretrial proceedings). *Miss. Bar Ethics Op. No. 246 (April 8, 1999); Miss. Bar Ethics Op. No. 211 (Nov. 18, 1993). See also, In the Matter of the Rules Of Professional Conduct And Insurer Imposed Billing Rules And Procedures*, 2 P.3d 806, 815 (Mont. 2000) (requirement of insurer prior approval in litigation management guidelines fundamentally interferes with defense counsel's exercise of independent judgment).

65.     Catlin's insistence that the Salop firm agree to abide by its litigation management guidelines fundamentally interferes with the Salop firm's duty to exercise its independent judgment on behalf of its client, Pilgrim. Catlin's right to impose litigation management guidelines on the Salop firm is made even more tenuous by the fact that the Salop firm is Pilgrim's *Moeller* counsel and does not represent Catlin in any capacity.

66.     Specifically, Pilgrim asserts that it is entitled to, and hereby seeks, a declaratory judgment that its *Moeller* counsel, Christopher Salop and the firm of Bings, Ingham & Salop PLC, is not required, as a matter of law and ethics, to agree to or abide by those provisions of the Catlin Litigation Management Guidelines which vest in Catlin the right of approval of *Moeller* counsel's litigation strategy and activities in conducting the defense of Pilgrim.

**D.     Claim against Catlin for breach of the insurance contract**

67.     Catlin insured Pilgrim under a professional liability policy which imposed an absolute duty on Catlin to provide a defense to Pilgrim for claims within the coverage of the policy.

68.     Pilgrim timely reported REM's claim against Pilgrim to Catlin on March 28, 2014. Catlin thereafter failed to diligently investigate such claim and failed to provide Pilgrim with a defense, which included by necessity costs incurred at the project site and elsewhere to investigate the cause of the drilling pipe failures.

69.     By failing to timely investigate REM's claim against Pilgrim, by failing to provide a defense to Pilgrim, and by failing to reimburse Pilgrim for any defense costs incurred before September 22, 2014, Catlin breached the contractual duties it owed to Pilgrim under the policy.

70.     Due to Catlin's breach of contract, Pilgrim is entitled to an award of damages from Catlin equal to all defense costs which Pilgrim expended prior to September 22, 2014, in the amount of $89,956.59.

**E.     Claim against Catlin for violation of Pilgrim's rights under *Moeller***

71.     Catlin's provision of a defense to Pilgrim on September 22, 2014, under a full reservation of rights, created a *per se* conflict of interest between Catlin and Pilgrim, its insured. Catlin's reservation of rights placed a special obligation upon it as insurer, requiring that Catlin give Pilgrim the right to select independent counsel to represent solely Pilgrim's interests and that Catlin pay the reasonable costs of Pilgrim's defense, including the fees and expenses of its independent counsel. *Moeller v. American Guarantee and Liability Insurance Company*, 707

-23-

So.2d 1062 (Miss. 1996).

72.    Catlin selected the Salop firm as its *Moeller* counsel to defend Pilgrim against the claims of REM.  Despite Pilgrim's clear rights under *Moeller*, Catlin has violated Pilgrim's rights by seeking to control the Salop firm; by imposing a right or prior approval on the Salop firm's conduct of Pilgrim's defense *via* litigation management guidelines; by attempting to induce Pilgrim to terminate the Salop firm through the use of factual and legal misrepresentations; and by refusing to pay the actual costs incurred by Pilgrim in defense of REM's claim, including the fees and expenses of Pilgrim's *Moeller* counsel.

73.    For the foregoing reasons, Catlin has breached the duties which it owes to Pilgrim under *Moeller v. American Guarantee and Liability Insurance Company*, and Pilgrim is entitled to recover of and from Catlin the full cost of its defense of the REM claims, including but not limited to its attorney's fees, expert witness and other expenses, and arbitration costs and fees. As of September 22, 2014, Pilgrim had incurred the amount of $89,956.59 in defense costs, and Pilgrim's expenses in defense of REM's claims are expected to increase.

## F.    Claim against Catlin for breach without a legitimate or arguable reason

74.    Catlin lacks a legitimate or arguable reason or basis for its wrongful breach of the duty to defend Pilgrim under the professional liability policy and for its wrongful breach of the duties which it owes to Pilgrim under *Moeller v. American Guarantee and Liability Insurance Company*.  Consequently, Pilgrim is entitled to recover from Catlin  all extra-contractual damages available under Mississippi law, including but not limited to, damages for Pilgrim's inconvenience and the attorney's fees and expenses to be incurred by Pilgrim in the prosecution

-24-

of this action.

### G.    Claim against Catlin for tortious breach of contract and/or punitive damages

75.    The duty of good faith and fair dealing inheres in every contract, including the professional liability policy issued by Catlin, and applies to the performance of Catlin's obligations under the policy.  Pursuant to such duty, Catlin is required to place the interests of its insured ahead of its own and to exercise the utmost good faith in the performance of its contractual obligations.

76.    Catlin breached the duty of good faith, acting in bad faith and without a legitimate or arguable basis, by refusing to provide a defense to Pilgrim for REM's claims from March 28 2014 to September 22, 2014 and/or by refusing to reimburse Pilgrim for its costs of defense incurred prior to September 22, 2014.

77.    Further, acting in bad faith and without a legitimate or arguable basis, Catlin has breached the contractual and/or common law duties it owed to Pilgrim under *Moeller v. American Guarantee and Liability Insurance Company.*

78.    Said breaches of duty by Catlin were attended by conduct on its part which was willful, malicious, grossly negligent, in reckless disregard of Pilgrim's rights, and which rises to the level of an independent tort or warrants the imposition of punitive damages.  Consequently, Catlin is liable to Pilgrim for punitive damages in an amount sufficient to punish it for its egregious conduct and to deter it, and other similarly situated insurers, from like conduct in the future.

79.    In the event of an award of punitive damages, Pilgrim is entitled to recover of and

from Catlin all reasonable attorneys' fees which Pilgrim has incurred, or will incur, in the prosecution of this action.

## IX

### Ad Damnum

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Pilgrim Construction Co., LLC, brings this action against the Defendants, National Union Fire Insurance Company of Pittsburgh, PA and Catlin Specialty Insurance Company, and demands judgment in an amount in excess of the jurisdictional limits of the United States District Courts, as follows:

(1)     Against National Union Fire Insurance Company of Pittsburgh, PA:

(A)     For the full costs of Pilgrim Construction Co., LLC's defense of the claim asserted by REM Directional, Inc., and for all other contractual benefits to which Plaintiff may be entitled under Commercial General Liability policy number GL1903165;

(B)     For all extra-contractual damages available under Mississippi law as compensation to Pilgrim Construction Co., LLC for its inconvenience, attorneys' fees and expenses of litigation incurred in the prosecution of this action;

(C)     For punitive damages, and in the event of an award of punitive damages, attorneys' fees incurred in the prosecution of this action; and

(D)     For all costs of court incurred herein; and

(2)     Against Catlin Specialty Insurance Company:

(A)     For declaratory relief in the form of a judgment that counsel which Pilgrim Construction Co., LLC retained under the authority of *Moeller v. American Guarantee and Liability Insurance Company*, 707 So.2d 1062 (Miss. 1996) is not required, as a

-26-

matter of law and ethics, to agree to or abide by those provisions of the Catlin Litigation Management Guidelines which vest in Catlin Specialty Insurance Company the right of approval of *Moeller* counsel's litigation strategy and activities in conducting Pilgrim Construction Co., LLC's defense of the claim by REM Directional, Inc.;

(B)    For the full costs of Pilgrim Construction Co., LLC's defense of the claim asserted by REM Directional, Inc., and for all other contractual benefits to which Plaintiff may be entitled under Professional Liability Insurance policy number CPV-675792-0614;

(C)    For all extra-contractual damages available under Mississippi law as compensation to Pilgrim Construction Co., LLC for its inconvenience, attorneys' fees and expenses of litigation incurred in the prosecution of this action;

(D)    For punitive damages, and in the event of an award of punitive damages, attorneys' fees incurred in the prosecution of this action; and

(E)    For all costs of court incurred herein.

## X

### Demand for Jury Trial

Plaintiff hereby demands trial by jury on all issues of fact presented in this action.

William Liston III (MSB #8482)
LISTON/LANCASTER PLLC
Post Office Box 14127
Jackson, Mississippi 39236
Tel. (601) 981-1636
Email: wlist3@aol.com

----- and -----

-27-

W. Lawrence Deas (MSB #100227)
DEAS & DEAS, LLC
Post Office Box 7282
Tupelo, Mississippi 38802-7282
Tel. (662) 842-4546
Email: Lawrence@deaslawfirm.com

ATTORNEYS FOR PLAINTIFF,
PILGRIM CONSTRUCTION CO., LLC